HELEN BUSCHALEWSKI, as Administratrix of the Estate of BRONISLAUS BUSCHALEWSKI, Deceased, Plaintiff, v. NEW YORK CENTRAL RAILROAD COMPANY, Defendant.

(Supreme Court, Erie Trial Term, January, 1919.)

Safety Appliance Act, §§ 2, 8 — provisions of — liability of carriers — action to recover damages for causing death of plaintiff's intestate — interstate commerce — Federal Employers' Liability Act, § 3 — verdict in plaintiff's favor set aside and complaint dismissed.

Section 2 of the Safety Appliance Act of Congress declares that it shall be unlawful for any carrier engaged in interstate commerce to haul, or permit to be hauled or used on its line, any car, used in moving interstate traffic, " not equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the cars." Section 8 of said act provides that any employee injured " by any locomotive, car or train in use contrary to the provisions of this act, shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car or train had been brought to his knowledge." Section 3 of the Federal Employers' Liability Act provides that in actions against the carrier " no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of

such employee." *Held,* that while in case of a violation of the Safety Appliance Act, the liability of the carrier is absolute, the application of said statute, the primary object of which is to save railroad employees from the necessity of going between the ends of cars, should be confined to defects in features specifically required to be supplied in couplers.

In an action to recover damages for causing the death of plaintiff's intestate predicated upon an alleged violation of section 2 of the Safety Appliance Act, it appeared that plaintiff's intestate was one of a switching crew, a part of whose duty it was to uncouple crippled cars from a train and place them where directed; that at the time he met his death he was not on the crippled car where he should have been, but was standing on the pilot of the engine which was next to said car and when remonstrated with by the locomotive engineer, told him, in substance, to mind his own business. It further appeared that the coupler on the crippled car met all the requirements of the statute so far as the coupling features were concerned, and that at the time of the accident, the crippled car and the train from which it was taken were engaged in interstate commerce by the United States government. *Held,* that there was no liability by reason of the death of plaintiff's intestate unless created by the supplementary act of Congress approved April 14, 1910, relating to the use of auto couplers and other safety appliances.

*Held,* further, that the part of section 4 of said supplemental act which, after imposing a penalty for a violation of the Safety Appliance statutes, except when a defective car is being moved for repair, provides that " where any car shall have been properly equipped, as provided in this Act and the other Acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure," etc., is in the nature of a saving clause rather than an act of enlargement, being an extending act only in so far as it declares that the carrier shall not escape liability to its employees because cars with appliances not meeting statutory requirements are being moved for purposes of repair, and the plaintiff is without remedy thereunder.

The verdict in plaintiff's favor set aside and the complaint dismissed.

MOTION for a new trial on the minutes and for a dismissal of the plaintiff's complaint.

Hamilton Ward, for plaintiff.

Maurice C. Spratt, for defendant.

WHEELER, J.   This action is brought to recover for the death of the plaintiff's husband, who was accidentally killed in the yards of the defendant's railroad at Gardenville just outside the city of Buffalo.   The action is in form against the railroad company, but the railroad at the time· of the accident was being operated by the United States government.

Plaintiff's intestate was one of a switching crew composed of himself, another employee and the engineer and fireman of a locomotive.   The yard consisted of six separate tracks all connecting with another track known as " the lead."   On four of the tracks stood trains of freight cars made up ready to be dispatched to points east of Buffalo.   On the arrival of the trains they were inspected for crippled cars.   The inspector had reported to the yardmaster a crippled car in the train standing on track 4, and also two crippled cars on track 6.   In each instance the crippled cars stood near the middle of their respective trains.   The yardmaster gave instructions to the intestate to take out the crippled car from the train on track 4 and place it on what is known as track 2 (the repair track).   At the same time he ordered intestate to take out the two crippled cars on track 6 and place them on track 2. It was the duty of the intestate to go to these cars and uncouple them from the rest of the train and place them where directed.   He proceeded to do so.   The engine was first attached to the end of the train on track four, and it pulled out some thirty cars from

track 4, backed down on the " lead," uncoupled the crippled car from the others, and then placed the others back on track 4. Having done this the engine again ran down on the " lead " and coupled on to the crippled car, hauled it up the lead, and ran it in on to track 6 for the purpose of coupling on to the end of the train on that track and by substantially the same operations to get out the two crippled cars of the train standing on track 6. The crippled car from track four attached to the engine came into contact with the end of the train on track 6 with sufficient force so that the draw-bar on the end of the car next the engine was forced back under the car and was broken loose from its fastenings to the car, and then dropped down on the car truck beneath. As a result the end of the freight car and the head of the engine came together, and intestate who was standing on the pilot of the engine was crushed between them, and so injured that he died. The trouble with the freight car for which it had been ordered to the repair shop by the inspector was that a certain timber underneath the car which was bolted to the frame of the car had in some manner been split and one or more of the bolts fastening to the frame work of the car were missing — and when the car came in contact with the car ahead owing to its weakened condition gave way. As this timber tended to secure the draw-bar and its attachments to the car the engine pushed the draw-bar back under the car, and the ends of the car and engine came together, crushing intestate. It was the practice of the inspector to chalk on the end of cars condemned as cripples the nature of the defects and to also nail a tag on the car indicating what was to be done, and this had been done in this instance, so that had the intestate desired he could have known just what the defects were. Whether as matter of fact he did read

from the writing on the car just what was the matter or not the evidence does not disclose, but he had the opportunity to do so, and was in fact advised by the yardmaster that the car was in a crippled condition, and that it was to be placed on the repair track for that reason. It was conceded that the car in question and the train from which it was taken were engaged in interstate commerce.

This action was brought by the plaintiff to recover damages for her intestate's death, the right to recover being predicated on an alleged violation of the Safety Appliance Act of Congress as to the use of couplers; the plaintiff contending that under the provisions of that act the carrier became absolutely liable for the death of the intestate. Defendant's counsel contended that the plaintiff had failed to make out a case under the provisions of the act, and moved for a nonsuit, and at the close of all the evidence asked for a dismissal of the complaint. The trial court reserved decision on the questions raised, to the end that the questions of law involved might receive more careful consideration than it was able to be given at the time; and directed the jury by their verdict to ascertain and report the damages sustained. The jury under these instructions rendered a verdict for the plaintiff for $12,500, apportioning to the widow the sum of $10,000 and to the infant daughter $2,500.

Defendant's counsel then moved to set aside the verdict and for a dismissal of the complaint on the grounds stated, and for the further reason that intestate assumed the risk of the employment and the accident was caused by his own negligence and failure to follow warnings previously given him not to stand where he was standing at the time he was killed, the same being a dangerous place likely to cause him injury.

35

In this way the case now comes before this court for review.

It is to be noted that nothing was in fact wrong with the coupler proper — so far as appears the coupler and draw-head or bar worked properly and automatically. It coupled all right with the engine when the engine backed down and hitched on to it as it stood on the lead. The automatic features prescribed by the statute were all present and worked. The defects related to the condition and fastening of certain timbers underneath the car which helped to secure the coupler and draw-head to the car. One or more of the bolts running through the timbers which fastened them to the body of the car were gone or broken so that the resisting strength of these timbers was weakened, and as a result, when the car was driven by the engine against the car ahead, the force of the contact drove the coupler proper against these timbers which gave way; and as a result the draw-head or coupler was forced in and under the car, and its attachments to the car broke away, and the coupler dropped down on to the truck beneath.

So far as I am able to discover from the evidence the method of attaching and bracing the automatic coupler, which this car had, was the same as those used to stay the old fashioned pin and link coupler. If instead of the automatic coupler having been on the car there had been on it at the time the old link-and-pin coupler and draw-head the timbers in question would have given away just the same, and the draw-head would have dropped just as it did in the case of the automatic coupler and draw-head or bar, so that it cannot be said the accident was in any sense due to the absence of the automatic coupling features prescribed by the act of Congress. Even though the timbers mentioned with the bolts fastening them to

the body of the car be deemed a part and portion of the coupler, or coupler appliance, nevertheless it is apparent that the giving away of the draw-bar and the accident which followed did not result from the noncompliance with any of the requirements of the Federal act relating to automatic couplers — and commonly called the Safety Appliance Law. This act so far as it relates to car coupler reads (§ 2): " It shall be unlawful for any such carrier [one engaged in interstate commerce] to haul, or permit to be hauled or used on its line any car used in moving interstate traffic *not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.*"

It will be observed that the coupler on this crippled car met all the requirements of the act so far as its coupling features are concerned. That in truth and in fact the coupler operated automatically and properly when the engine hitched onto it as it stood on the " lead," and was hauled up the lead and was pushed onto the switch track where the accident happened.

These facts present the interesting question of law whether the drastic provisions of the Federal Safety Appliance Act applies only to the failure to supply an *automatic coupler,* or to other defects in the coupling appliance. So far as the court is able to discover the question presented is new, and has never before been passed on by the courts.

By section 8 of the act it is provided that any employee injured " by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

Section 3 of the Federal Employers' Liability Act further provides that in actions against a carrier " That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

Consequently by virtue of the two statutes practically in cases of a violation of the Safety Appliance Act the liability of the carrier becomes absolute. *St. Louis & Iron Mountain & Southern R. Co. v. Taylor,* 210 U. S. 281; *Chicago, Burlington & Quincy R. Co. v. United States,* 220 id. 559; *Texas & Pacific R. Co. v. Rigsby,* 241 id. 33; *Minneapolis & St. Louis R. R. Co. v. Gotschall,* 244 id. 66.

It is needless to say that the provisions of the statute are very drastic so far as fixing the liability of the carrier. In view of these features of the Federal legislation, can it be fairly claimed that the statute should be deemed to apply to every and all defects in coupler appliances? We think its application should be confined to defects in features specifically required to be supplied in couplers. What are these requirements? They are that cars engaged in interstate traffic shall be " *equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the cars.*"

I am unable to discover that the car in question in any way failed to comply with the requirements of the act. The statute does not in terms require that the coupler or coupler appliances should be perfect and free from all defects of every kind; and yet if the contention of the plaintiff is correct it would seem that the carrier becomes absolutely liable for any defect in

coupler appliances which might result in an employee being injured by the couplers not holding, irrespective of the fact whether it coupled automatically or not, or could be uncoupled without train men going between the ends of the cars.

The reading of the statute shows the primary object of the statute is to save railroad employees from the necessity of going between the ends of cars, and the coupler provisions of the Safety Appliance Act are directed against those dangers which attended the old fashioned link and pin coupler. It was so said in *St. Louis & San Francisco R. R. Co.* v. *Conarty,* 238 U. S. 243.

The requirements of the Safety Appliance Acts the decisions hold are met if the devices have the essential features prescribed by the statute. *United States* v. *Montpelier & W. R. R. Co.,* 175 Fed. Repr. 874, 875; *Chesapeake & O. R. Co.* v. *Charlton,* 247 id. 34; *Devine* v. *Calumet River R. Co.,* 259 Ill. 449; *Morris* v. *St. Louis & Southwestern R. Co.,* 158 S. W. Rep. 1055.

The considerations above stated lead the court to the conclusion that there exists no liability by reason of the death of the plaintiff's intestate unless one is created by the supplementary act of Congress approved April 14, 1910, relating to the use of automatic couplers and other safety appliances. Shortly before the passage of this latter act, Judge Archbald of the United States District Court rendered a decision in the case of *Siegel* v. *N. Y. C. & H. R. R. R. Co.,* 178 Fed. Repr. 873, in which he held that where the coupling apparatus of a car engaged in interstate commerce was found, on inspection, to be defective, and the car was being shifted about for the purpose of sending it to a shop for repairs, and an accident happened owing to the condition of the coupling apparatus the

master was not liable under the provisions of the Safety Appliance Act.

After this decision was rendered and on April 14, 1910, Congress passed an act to supplement what is commonly known as the Safety Appliance Act relating to various safety appliances, such as couplers, hand-holds, ladders, hand brakes and other safety appliances, referring to such prior acts by date of their passage. Section 4 of this act imposes a penalty of $100 for each and every violation of such acts, except when a defective car is being moved for repair, but contains the following saving clause:

" § 4. Provided, That where any car shall have been properly equipped, as provided in this Act and the other Acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure, to the nearest available point where such car can be repaired, without liability for the penalties imposed by section four of this Act or section six of the Act of March second, eighteen hundred and ninety-three as amended by the Act of April first, eighteen hundred and ninety-six, if such movement is necessary to make such repairs and such repairs cannot be made except at such repair point; and such movement or hauling of such car shall be at the sole risk of the carrier, and nothing in this section shall be construed to relieve such carrier from liability in any remedial action for the death or injury of any railroad employee caused to such employee by reason of or in connection with the movement or hauling of such car with equipment which is defective or insecure or which is not maintained in accordance with the requirements of this Act and the other Acts herein referred to; and

nothing in this proviso shall be construed to permit the hauling of defective cars by means of chains instead of drawbars, in revenue trains or in association with other cars that are commercially used, unless such defective cars contain live stock or ' perishable freight.' "

It may be that Judge Archbald's decision in *Siegel* v. *N. Y. C. & H. R. R. R. Co.,* influenced the passage of this act.

It is contended by the plaintiff in this action that even though the carrier is not to be held liable under the original act, nevertheless this supplementary act has enlarged the liability of the carrier as to the use of couplers and other safety appliances and that if couplers are defective in any respect whatever, independent of the automatic features prescribed by the statute, and an employee is killed or injured by reason of such defect while a car is being moved the carrier becomes absolutely liable for damages.

Plaintiff's counsel places reliance on the words of the supplementary act saying that where " *such equipment shall have become defective or insecure* * * * *"* such car may be hauled for repair but " *such movement or hauling shall be at the sole risk of the carrier* " and the carrier shall not be relieved from liability in connection with the movement " of such car with equipment which is defective or insecure *or* which is not maintained in accordance with the requirements of this act."

The argument of counsel is that the coupler appliances were defective and insecure within the meaning of this supplementary act even though the automatic coupling features were present.

We do not think it was the intention of Congress in any way to enlarge the liability of the carrier to employees except to save to them the same liability in

moving for repair as was given them for the use of such defective cars in handling traffic and transportation generally. To extend the liability to any defect outside the statutory requirements as to equipment would operate to penalize the carrier for an honest effort to comply with such statutory requirements.

We cannot think Congress had any such purpose. The statute should receive a fair interpretation to carry out its purposes; but as was said in *St. Louis & Iron Mountain R. Co.* v. *Taylor,* 210 U. S. 295: " Certainly the statute ought not to be given an absurd or utterly unreasonable interpretation leading to hardship and injustice, if any other interpretation is reasonably possible."

The language used in the supplementary act referred to was doubtless employed so that it should cover the many and various things required by the Safety Appliance Acts outside of couplers and coupler appliances, and the prior words quoted are all qualified by the words *" which are not maintained in accordance with the requirements of this and the other Acts herein referred to."*

In other words we think section 4 of the supplementary act partakes of the nature of a saving clause rather than of an act of enlargement, being an extending act only in so far as it declares that the carrier shall not escape liability to its employees for reason that cars with appliances not meeting statutory requirements are being moved for purposes of repair. To hold otherwise would be placing a construction on the statute making it more hazardous so far as the question of liability is concerned to attempt to repair defects and comply with the statute than to haul the car in ordinary traffic. This we submit could never have been the intention of Congress, nor does the lan-

guage of the supplementary act require such an interpretation be placed upon it.

Plaintiff's counsel cites as applicable to the facts in this case the decision of the United States Supreme Court in *Minneapolis & St. Louis R. R. Co.* v. *Gotschall*, 244 U. S. 66, where a head brakeman engaged in interstate commerce was proceeding along the tops of cars toward the locomotive when the train parted because of the opening of a coupler on one of the cars, resulting in the automatic setting of the emergency brakes, and a sudden jerk which threw the brakeman off the train and under the wheels. The jury was permitted to find negligence on the part of the company from the fact that the coupler failed to perform its function, " there being no other proof of negligence."

The Supreme Court sustained this ruling, holding it was but an application of the principle known as *res ipsa loquitur.* The case seems to have been disposed of in the trial court and in the Supreme Court upon the theory that the railroad company was guilty of common law negligence in permitting a defective car to be used in its trains, rather than upon an accident resulting from a mere violation of the Safety Appliance Act in relation to couplers. In any event the defect in the *Gotschall* case was a defect in the coupler itself and its coupling features, which distinguishes it from the defects in this case. In the *Gotschall* case the brakeman was engaged in operating a regular running train, whereas in this plaintiff's intestate undertook to move for purposes of repair a car known to be crippled, and where he must be held to have assumed the dangers incident to that operation unless the Safety Appliance Act clearly saved him under all the circumstances from the operation of the general rule of law which holds that

the employee assumes the risk incident to such an undertaking.

Upon the evidence as presented on the trial we are unable to see how the plaintiff can recover unless a recovery can be sustained under the provisions of the Safety Appliance Acts. The evidence shows that it was a part of intestate's duty to assist in moving crippled cars, taking them out of trains and placing them on tracks for repair. He was familiar with these duties, and the risks incident to the work. He knew this car was crippled. The markings of the inspector on the car advised him of the character of the defects. If he did not in fact read them they were there to be read. It would seem that he assumed the hazards incident to the employment.

Again the evidence showed that at the time the employee met his death he was riding on the pilot of the engine next to the freight car in question — a place of danger — and the very place which the Safety Appliance Acts treat as particularly dangerous, dangers which the provisions of the act sought to obviate. There was no necessity of his taking this position and intestate was remonstrated with by the locomotive engineer for doing so, but intestate replied in substance for the engineer to mind his own business. The evidence was to the effect that intestate's proper position was on the car being moved so as to give the engineer the proper signal to slow down when the car approached the car onto which it was to be coupled. While under the Federal Employers' Liability Act his contributory negligence does not preclude a recovery where the master is negligent also, nevertheless upon the whole evidence we cannot see how the case has been made out. If we are in error the damages have been ascertained by the verdict of the jury and in case of an appeal if the appellate courts take a contrary

view and determine the plaintiff should recover, it can reverse and reinstate the verdict without necessitating a new trial.

We think the verdict should be set aside and the plaintiff's complaint dismissed.

Ordered accordingly.