JOHN F. DEVINE, Admr., Defendant in Error, *vs.* THE CHI-
CAGO AND CALUMET RIVER RAILROAD COMPANY, Plain-
tiff in Error.

*Opinion filed June 18, 1913—Rehearing denied October 15, 1913.*

1. RAILROADS—*what is not necessary to create a liability under the Federal Safety Appliance act.* It is not necessary, in order to create a liability under the Federal Safety Appliance act, that the locomotive or car complained of shall be, at the precise time of the injury, actually engaged in inter-State commerce.

2. SAME—*test in determining applicability of the Federal Safety Appliance act.* The test in determining the applicability of the Federal Safety Appliance act and its amendment is the use of the locomotive or car on a railroad which is a highway of inter-State commerce, and not the particular use that is being made of it at the time of the accident.

3. SAME—*every part of a continuous transportation of goods from one State to another is inter-State commerce.* Every part of the transportation of goods in a continuous passage from one State to a designated point in another State is inter-State commerce, and every common carrier that participates in the transportation of such goods is engaged in inter-State commerce though its particular part of the transportation is wholly within one State.

4. SAME—*when a railroad company is engaged in inter-State commerce.* A railroad company which hauls car-load shipments, destined for points outside the State, from a manufacturing plant to the point where its track connects with inter-State railroads and there delivers them to the latter roads, and which receives from inter-State railroads, at the connection of its track with theirs, car-load shipments from points outside the State and delivers them to the manufacturing company on its own tracks, is engaged in inter-State commerce.

5. SAME—*when Federal Safety Appliance act is violated.* The use by a railroad company of a locomotive not equipped as required by the Federal Safety Appliance act is a violation of such act, even though the locomotive is used upon tracks within the enclosure of a manufacturing plant, where such tracks are leased by the railroad company and used by it in connection with inter-State commerce.

6. SAME—*question of proximate cause of injury may be a question of law.* While the question of proximate cause is ordinarily one of fact to be determined by the jury, yet it may, under certain conditions of the evidence, become a question of law for the court.

259 – 29

7. SAME—*when a defective automatic coupler is not the proximate cause of injury.* The death of a switchman, caused by being thrown from the foot-board of a locomotive when the locomotive was derailed while a "kicking switch" was being executed, cannot be said to be due to a defective automatic coupler which made it necessary to pull the pin by hand, where the evidence shows that he would have been riding on the foot-board, as he was at the time of the accident, even though the automatic coupler had been in perfect condition.

8. SAME—*Safety Appliance acts do not require any particular automatic coupler.* Any standard coupler which will couple automatically by impact, and which can be uncoupled without the necessity of men going between the cars, will satisfy the requirements of the Federal and State Safety Appliance acts.

9. SAME—*violation of Safety Appliance act must be the proximate cause of the injury.* The violation of the Safety Appliance act charged in the declaration must have been the proximate cause of the injury in order to authorize a recovery, and it is not sufficient that it may have brought about a condition which made the injury possible by the intervention of other disconnected and immediate causes.

10. SAME—*when court should direct verdict for railroad company.* The court should direct a verdict for the defendant railroad company where the only negligence charged in the declaration is a violation of the State and Federal Safety Appliance acts but the evidence shows that the proximate cause of the injury was the derailment of the locomotive, with which the violation of the Safety Appliance laws had nothing to do further than to furnish the reason why the injured servant was riding on the locomotive, and where the evidence shows that he would have been in the same situation had there been no violation of the Safety Appliance acts.

CARTER, J., dissenting.

WRIT OF ERROR to the Branch "B" Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. WILLIAM H. MCSURELY, Judge, presiding.

FRANK M. COX, and SHERIFF, DENT, DOBYNS & FREEMAN, (ANDREW R. SHERIFF, and R. J. FELLINGHAM, of counsel,) for plaintiff in error.

JAMES C. MCSHANE, for defendant in error.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The defendant ·in error, as administrator of the estate of James H. Patton, deceased, obtained a judgment for $10,000 damages against the Chicago and Calumet River Railroad Company in an action on the case for negligently causing the death of defendant in error's intestate. The case was submitted to the jury upon ·the fifth and˙ sixth counts of the declaration, one of which charged the violation of the Federal Railroad Safety Appliance act in using upon its railroad a locomotive engine that was not equipped with an automatic coupler which could be uncoupled from the side of the engine and without the necessity of going between the end of the engine and the car from which it was to be uncoupled. The other count charged a like viola-. tion of the Safety Appliance act of the State. Both counts alleged that the deceased was required to, and did, ride between the engine and the car for the purpose of uncoupling them, and by reason of the condition of the coupling appliance was thrown from the engine and received the injuries from which he afterwards died. The only negligence charged in either of said counts of the declaration is a failure to comply with the Federal and State statutes in regard to the automatic coupler required.

The facts are, in substance, as follows.: The Western Steel Car and Foundry Company, at Hegewisch, Illinois, was an incorporated company engaged in the manufacture of steel freight cars and in the repair of the same. It used in connection with its plant about one hundred acres of land, which was enclosed by a high board fence, except on the west side, which was bounded by the Calumet river. Inside of its enclosure the foundry company had laid numerous railroad tracks connecting its various buildings with the tracks of railroad companies ˙outside of its grounds. The foundry company also owned two locomotives, five flat-cars, one gondola car and one box car, which were intended for use in handling the foundry company products

in and out of its factory and from one place to another within its enclosed grounds. All of its railroad tracks except that portion of the tracks that was inside of its buildings, and all of its rolling stock and other equipment for the operation of its cars, were at the time of the accident in question in the possession of and being operated by the Chicago and Calumet River Railroad Company, plaintiff in error, under a lease from the foundry company. Plaintiff in error performed two distinct classes of service. It received car-loads of material, such as iron, coke, lumber and the like, intended for the foundry company, at the gates or openings in the fence where they were delivered by railroad companies, and moved such cars over its tracks to the desired point inside the foundry company's grounds. It also hauled finished cars out to the gate, where they were received by the railroad companies and carried to their destination. For its services in handling car-loads of material plaintiff in error received its compensation from the railroad company delivering said cars to plaintiff in error, by some sort of a division of freight charges. Plaintiff in error also did a class of service that was paid for by the foundry company which was exclusively for its benefit. This work consisted in moving cars loaded with waste and refuse from the buildings where the same accumulated to a dumping point, which was reached by one of the tracks inside of the enclosure known as the "kindling track." At the time of the accident in which Patton was injured plaintiff in error had its locomotive coupled onto three flat-cars which were loaded with waste material that had accumulated in the factory from the making of new and the repair of old cars. The loads were three or four feet high, and the scrap wood and waste were held in place with sticks set up at the sides of the cars. The object was to run these three cars of waste down on the kindling track, to be there unloaded as waste. In order to accomplish this, a switching movement known as "kicking" was attempted. This movement

is accomplished by pushing the cars to be switched in front of the locomotive until they acquire momentum sufficient to carry them to the desired point. They are then uncoupled from the locomotive and allowed to run under the impulse of the acquired motion while the locomotive slackens its speed and is brought to rest. In order to make this switching movement it was the duty of the deceased to ride on the front running-board of the locomotive, so as to be in a position to pull the pin and detach the cars when the required speed had been attained. The deceased was upon the running-board of the locomotive, as described, when the locomotive started to kick the cars down on the kindling track. The locomotive had moved these cars a distance of approximately fifteen hundred feet before they were uncoupled. The uncoupling is done and the locomotive slackened at a signal, which is usually given by the conductor or the head switchman. There was a frog connecting the kindling track with another track at or near the place where the locomotive was uncoupled from the cars on the day of the accident. The evidence is uncontradicted that the steam brake on the locomotive was out of repair, and had been for two or three weeks, so that it could not be used. The only way the locomotive could be stopped was by reversing the lever, which would cause a rocking or swaying motion of the locomotive. At the time of the accident, and at the proper time, the deceased drew the pin and the cars were kicked down on the kindling track. After they were separated from the locomotive the engineer reversed his lever and the locomotive was derailed. It ran sixty-five feet on the ties and then one set of drivers got down upon the ground and it ran some distance, sinking the wheels into the ground, and was finally brought to rest by striking a water-plug some two or three feet from the rail. The deceased was thrown from the running-board and his feet were caught under the locomotive, and he received injuries from which he died five or six months later. The evidence

shows that the tracks at the place where the derailment occurred were not well ballasted. The evidence also tends to show that the track was poorly constructed. The deceased had worked for a considerable length of time around these yards and for several months had been a switchman for plaintiff in error.

The Appellate Court for the First District affirmed the judgment below, and the record has been brought to this court by a *certiorari.*

At the close of the evidence for defendant in error, and again at the close of all the evidence, plaintiff in error asked the court to instruct the jury to find it not guilty and submitted instructions for that purpose, which were refused. Plaintiff in error contends that there was error committed in refusing its request for a directed verdict (1) because it was not engaged in either inter-State or intra-State commerce at the time of the accident, and consequently neither the Federal nor State statute declared upon has any application to its locomotive at the time of the injury; (2) that if it be conceded that the locomotive was being operated, at the time of the accident, contrary to the provisions of both the Federal and State acts, it is earnestly contended that the accident was not the proximate result of the violation of the statutes complained of. If either of these contentions is sustained it will necessarily result in a reversal of the judgment.

Upon the first proposition plaintiff in error argues that neither of the statutes has any application to such a movement of cars as the one here in question. It is not necessary, to create a liability under the Federal statute, that the car or locomotive in question should be actually engaged in inter-State commerce at the precise time when an injury occurs. The Supreme Court of the United States, in *Southern Railway Co.* v. *United States,* 222 U. S. 20, has given a construction to the Federal act and its amendment, and it is there held that the test is the use of the vehicle on a

railroad which is a highway of inter-State commerce, and not the particular use that is being made of it at the moment of the accident. The evidence in the case at bar shows that cars loaded with freight billed to the foundry company came to the point where plaintiff in error's tracks connected with inter-State roads and were there received by plaintiff in error and hauled over its tracks to their final destination. In handling both incoming and outgoing cars as a connecting line with inter-State railroads plaintiff in error was engaged in inter-State commerce. Every part of the transportation of goods in a continuous passage from one State to a designated point in another State is inter-State commerce, and every common carrier that participates in the transportation of such goods is engaged in inter-State commerce even though the particular part of the transportation of a given carrier is wholly within one State. (*United States* v. *Colorado and Western Railroad Co.* 157 Fed. Rep. 321.) We are of the opinion that the court properly held that plaintiff in error was engaged in inter-State commerce, and, applying the same line of reasoning to freight handled by plaintiff in error from and to points within the State, it might well be held that plaintiff in error was amenable to the State law in reference to safety appliances.

Plaintiff in error's second proposition, that conceding it owed the duty, under either or both of these statutes, to equip its locomotive with an automatic coupler and that it failed to discharge that duty, still its failure in that regard was not the proximate cause of the injury, presents a more serious question. While the general rule is that the question of proximate cause of an injury is one of fact for the jury, still where there is no dispute as to the facts and the facts are such that all reasonable minds must reach the same conclusion in regard thereto, it may become a question of law to determine whether a given injury is the proximate result of a given cause. The locomotive in question was equipped with an automatic coupler. As we understand the evidence,

it was a coupler that would couple by impact, and that it was not necessary to go between the cars in order to make a coupling. It did not, however, have the lever extending from the coupler to the side, which would permit a switchman to uncouple it without the necessity of going between the cars, and hence the coupling device did not literally comply with the requirements of either the Federal or State statute. Four witnesses who are experienced railroad men testify that in order to make a kicking switch of cars it is necessary for the brakeman to ride on the running-board of the locomotive for the purpose of pulling the pin at the proper time. In other words, it is contended that the deceased would have been exactly at the place he was if the coupler had been provided with the necessary lever so that it could have been uncoupled or coupled without the necessity of going between the cars. It is absurd to suppose that had this coupler been provided with the lever extending to the side of the car it would have been practicable for the deceased to have remained on the ground and followed the car so as to have been at the place to pull the lever when the proper time arrived. The distance traveled and the speed of the train preclude the possibility of any such performance as that. There is no dispute that the only practicable method of performing this sort of a switching movement is for a man to ride the engine so that he may pull the pin when the required momentum is reached, and this is so reasonable that we are forced to the conclusion that the undisputed evidence of these four witnesses must be accepted as true. If, as these witnesses say, it would have been necessary for the deceased to be on the running-board even if the locomotive had been equipped with the character of coupler required by law, then how can it be said that his presence upon the running-board was due to the absence of such coupler?

Defendant in error suggests that there is a particular kind of automatic coupler that will enable the operator to

raise the pin so as to permit the car to uncouple and will hold the pin above the coupler until it is jarred into place by impact. It is suggested that if this cocking device had been in use on this locomotive the deceased might have raised the pin before the movement commenced, and that the cars could thus have been uncoupled while the locomotive was standing still. Even if it be conceded that there is such a coupler known among railroad men, still the statute declared on does not require all railroads to adopt and use that particular device. Any standard coupler which couples automatically by impact and which can be uncoupled without requiring men to go between the ends of cars would satisfy the statute. These statutes do not require automatic couplers with a cocking device so rigid that it will hold the pin above the coupler during the jar and jostle of a switching movement. It must be remembered that the pin or block in the coupler that drops down and locks the knuckle of the coupler, when it is elevated above its socket must be released by impact in order to effect the coupling. It is no doubt true, as contended by defendent in error, that the pins or blocks in most standard automatic couplers have a slight shoulder or dog that will hold them in position above the socket after the lever has been pulled in an uncoupling operation. The pulling of the lever raises the pin or block and releases the knuckle and thus effects an uncoupling. If the pin drops back to position in the socket the car will not couple automatically until the pin is again raised. All automatic couplers are supposed to have a small shoulder or dog that will hold the pin or block above the socket until there is some jar or impact or movement of the car which will jar it off the shoulder or dog and permit it to drop of its own weight into its socket. It seems, as a mechanical proposition, that any cocking device that would hold the pin in position for a switching movement such as was made in the case at bar would prevent the contrivance from coupling by impact. Whether this is true or not, the evi-

dence in this case fails to show that there is any automatic coupler in use, or known, with a cocking device which will hold the pin in suspension above its socket while the cars are being shoved or pushed about by the locomotive, and if such a device is known, neither the Federal nor State statute requires its use. If the locomotive in question had been equipped with the lever to operate the coupler from the side of the car it would still have been necessary for the deceased to have adopted one of three methods in order to uncouple the car in making this switch. If he was able to run along by the side of the locomotive until the time to uncouple, he might have remained on the ground and uncoupled by simply reaching in and pulling the lever. Whether this was possible would have depended on the speed of the engine and the distance traveled before the uncoupling was made. If there was a stirrup on the car next to the locomotive, it is possible that he might have stood on the stirrup and supported himself by holding to one of the sticks that held the load on the car with his left hand and reached in and uncoupled the car with his right. All cars other than flat-top cars, such as these were, are required to be equipped with such stirrups and grab-irons above, so that the switchman may stand on the stirrup and support himself with the hand-holds above, to operate the coupler. The third method was the one adopted by the deceased,—that is, to ride upon the foot-board of the locomotive and from his position reach down in front of him to lift the crank of the lever and thus uncouple the car. Considering the distance traveled, the speed of the locomotive and the character of the car that was to be kicked, it seems to us the witnesses who testify that under the circumstances of this movement it was necessary for the deceased to ride upon the foot-board of the locomotive in order to uncouple these cars, state an incontrovertible proposition of fact. The presence of the deceased upon the foot-board of this locomotive was not, therefore, due to the

absence of a lever or handle upon. the coupler, but was due to the fact that there was no other practicable way in which the operation could be performed.

There is another view which may be suggested. Assuming, for the sake of argument, that the absence of the lever upon the coupler in question made it necessary for the deceased to ride upon the running-board of the locomotive, and while so riding there he was injured by another independent cause or agency not in any way connected with the negligence complained of, can it be said that the defective coupling appliances were the proximate cause of the injury? It is perfectly plain that this man was thrown from the running-board by a defect in the brake upon the locomotive, or by that defect in conjunction with the bad condition of the track. At the time deceased was thrown from the running-board the purpose for which he had gotten upon.it had been accomplished,—the cars had been uncoupled. If, after the uncoupling had been effected in safety and the locomotive separated from the cars, there had been a good and sufficient brake upon the locomotive and a good, solid track below the wheels, there would have been no difficulty in stopping the locomotive by the application of the brake without throwing the deceased from the foot-board. But the locomotive had no brake. It could only be stopped by reversing the lever. This imparted a swaying motion to it, which, in connection with the defective track, caused the derailment, and the deceased was jostled from the foot-board after the locomotive got off of the rails. Under these facts the direct and proximate cause of the injury was the derailment of the locomotive, and the derailment was an independent cause, not in any way connected with the defect in the coupling appliances, that caused the injury. If the failure to have the locomotive equipped with an automatic coupler such as is required by the statutes does no more than to bring about a condition which makes the injury possible by the intervention of some other disconnected

cause, then the negligence complained of is not the proximate cause of the injury. It seems to us that the most that can possibly be said of the negligence charged in the declaration is, that it produced a condition which, being operated upon by other disconnected acts of negligence, caused the injury complained of.

It results from the views which we have expressed that in our opinion the trial court erred in not sustaining plaintiff in error's motion for a directed verdict and that the Appellate Court erred in affirming that judgment.

The judgments of the superior court of Cook county and the Appellate Court for the First District are reversed and the cause is remanded to the superior court.

*Reversed and remanded.*

Mr. JUSTICE CARTER, dissenting:

I cannot agree with the conclusion stated in the opinion that the defective coupler was not the proximate cause of the injury. The evidence of at least two witnesses shows that in making such a switch or movement as was going on at the time of the accident there was no reason why the coupling pin could not be raised either before or at the time the cars were started, provided the appliances were such that the pin could be held up when once raised. It also shows that there were different kinds of couplers in general use which would hold the pin up under such circumstances, and thereby render it unnecessary and useless for a switchman to ride between the engine and car in making a kicking switch. The uncontradicted evidence shows there was no way to keep the coupling on the engine here in question up, when once raised, except by holding it up by the hand; that if it was not thus held up it would immediately drop back into place and thereby lock the coupler. The Federal and State acts that bear on this subject make it unlawful for any common carrier subject to the provi-

sions of the acts to haul or use on its line any engine or
car "not equipped with couplers coupling automatically by
impact and which can be uncoupled without the necessity
of a man going between the ends of the cars." This nec-
essarily means, also, between the end of the engine and a
car. It was contrary to both of these statutes to use the
engine in question with a coupler in such condition that it
was necessary for a switchman to go between the engine
and the car to uncouple them in making a switch. These
statutes leave it to the carriers to adopt whatever particu-
lar kind of coupler they prefer, provided that the coupler
used be such as will couple automatically and can be un-
coupled without the necessity of a man going between the
engine and the cars. If there were no couplers which would
permit an engine and car to be uncoupled without the ne-
cessity of a man going between them to make a kicking
switch like the one in question it might be claimed that
the statutes were unreasonable, but the evidence in this rec-
ord is that such couplers are in use. If the exercise of
reasonable care in maintaining the statutory standard of
equipment will not exempt a car movement as being beyond
the spirit of the statute, much less will mere convenience
be accepted as an excuse. *Chicago Junction Railway Co.*
v. *King,* 94 C. C. A. 657.

The evidence shows that it was the custom in this yard
for the switchmen to ride between the engine and car, as
deceased did, when making a switch of this kind, but I can
not concur in the conclusion that this custom necessarily ex-
isted irrespective of any kind of coupler on the engine. I
find no evidence in the record in conflict with the testimony
of the two witnesses in question that there were couplers in
general use which were so constructed that they could be
uncoupled in such a switching movement without the ne-
cessity of men going between the engine and car. Neither
do I agree with that part of the opinion that states, even

though the failure to comply with the law as to the coupler in question required deceased to ride upon the running-board of the locomotive, such failure to comply with the law was not the proximate cause of the injury.