**UNITED TRANSPORTATION UNION, et al., Appellants,**

v.

**Drew LEWIS, Secretary of Transportation, et al.**

No. 81–2307.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 23, 1982.

Decided June 17, 1983.

Lawrence M. Mann, Washington, D.C., for appellants.

John D. Bates, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees. Kenneth M. Raisler, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellees.

William G. Schaefer, Jr., Washington, D.C., with whom R. Eden Martin and Ronald S. Flagg, Washington, D.C., were on the brief for appellees, Seaboard Coast Line R. Co.

Before GINSBURG, Circuit Judge, BAZELON and MacKINNON, Senior Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

Appellants United Transportation Union (the Union), T.E. Lloyd and Patrick Saunders challenged in district court the decisions of appellees Drew Lewis, Secretary of Transportation, and Robert W. Blanchard, Federal Railroad Administrator, (1) that use of metal hooks to open coupler knuckles during railroad humping operations does not violate section 2 of the Safety Appliance Acts,[1] and (2) that no basis existed under the Federal Railroad Safety Act of 1970[2] for issuing an emergency order pro-

---

1. Act of March 3, 1893, ch. 196, § 2, 27 Stat. 531, codified at 45 U.S.C. § 2 (1976). Section 2 provides:

> [I]t shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

2. Pub.L. No. 96–423, § 3, 94 Stat. 1811 (1980), codified at 45 U.S.C. § 432(a) (Supp. IV 1980), provides:

> If the Secretary determines, on the basis of testing, inspection, investigation, or research carried out pursuant to this subchapter, that an unsafe condition or practice, or a combination of unsafe conditions or practices, or both, create an emergency situation involving a hazard of death or injury to persons, the Secretary may immediately issue an order, without regard to the provisions of section

hibiting such use. In two separate orders, the district court held that these decisions were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *United Transportation Union v. Lewis,* No. 81–0633 (D.D.C. Nov. 12, 1981); *id.* (May 29, 1981). We affirm both decisions.

## I. BACKGROUND

### A. *The Hook Procedure*

Many railroads have classification (switching) yards that include an elevated area known as the "hump" over which are moved lines of freight cars that must be separated and then reassembled with other cars having a common destination. The hook procedure at issue here is a new development for increasing the efficiency of humping operations. Traditional humping operations are performed by a single switchman. As a group or "cut" of cars is pushed slowly[3] over the crest of the hump, the switchman uncouples the lead car from the cut by pulling a "cut-lever" attached to the front coupler on the following car. This opens the coupler of the following car and causes the lead car to uncouple, which then by the force of gravity moves away from the cut down into the area below, known as the "bowl." During its descent, each car is switched by remote control onto its designated track, where it couples by impact with other cars to form a new cut

for delivery to a common destination.[4] Only one of the two coupling knuckles needs to be open for cars to disengage or to couple on impact.

Despite the use of perfectly functioning equipment, however, the traditional method of performing humping operations, with one switchman pulling one cut-lever, cannot assure that cars will always couple on impact in the bowl. The vibration of an uncoupled car as it descends into the bowl, or the jarring that occurs when the cars meet, may cause the knuckles of the couplers to close or the drawbar to move out of alignment for coupling. Tr. of Special Safety Inquiry, *supra* note 4, at 207 (testimony of Charles F. Kelly) (JA 125). Either such result may prevent the car from coupling.[5] A switch engine and crew must then be brought to the scene to complete the coupling. This may require a switch engine to separate the cars further and a yard employee to open or manually realign the coupler knuckles of the cars in the bowl. The switch engine then must push the cars together to accomplish the coupling. *Id.* at 201 (testimony of Charles F. Kelly) (JA 119); *id.* at 208 (testimony of T.A. Brown) (JA 126). In addition to the added delay and expense of such a preparation, it must be performed in the bowl, which is one of the most hazardous work areas for yard personnel.[6] Affidavit of John G. McCormick at 2, 4 (JA 211, 213).

431(b) of this title, imposing such restrictions or prohibitions as may be necessary to bring about the abatement of such emergency situation.

3. Cars moving over the crest of the hump travel at the speed of 2–2.5 miles per hour. *See, e.g.,* Memorandum from F.N. Vincent, Operating Practices Safety Inspector, to Director of Railroad Safety, Region Three, at 1 (April 18, 1980) (JA 42).

4. *FRA Special Inquiry on "Use of Metal Hooks,"* Docket No. RSSI–80–1 (Tr. of Oct. 28, 1980) at 194–98 [hereafter "Tr. of Special Safety Inquiry"] (testimony of Charles F. Kelly) (JA 112–16).

5. That the knuckle on the coupler closes or that the drawbar goes out of alignment with the next car due to vibration or jarring does not

indicate that the coupler is "defective." To be effective the coupling apparatus must permit limited lateral movement of the drawbar in order to allow the cars, when coupled together, to pass around curves without derailment and to allow coupling on a curve. Occasionally, drawbars move so far out of alignment as to preclude automatic coupling. It then becomes necessary to adjust the drawbar or the coupling knuckle, and this may require going between the cars. *Metcalfe v. Atchison, Topeka & Santa Fe Ry.,* 491 F.2d 892, 896 (10th Cir. 1974). After 90 years automatic *realigning* devices, as opposed to automatic *coupling* devices, are still in the experimental stage and have been installed on less than one percent of railroad cars. *Id.* at 896 n. 2.

6. The bowl has greater car and track congestion than the area at the crest of the hump where there are only two tracks. *See* Map of

In order to reduce the frequency of such manual adjustments by trainmen in the bowl, intervenor Seaboard Coast Line Railroad Company (Seaboard) and other railroads [7] conceived and instituted in 1979 the hook procedure which is the subject matter of this case. Notice of Special Safety Inquiry at 2 (JA 78). Departing from the traditional procedure, Seaboard adds a second switchman on the hump. As the cut passes over the hump, one switchman stationed at the front of the second car operates its cut-lever, which causes the lead car to uncouple from the rest of the cars in the cut. Immediately *after* the lead car is uncoupled [8] the second switchman stationed on the other side of the rails pulls the rear cut-lever of the lead car and, shortly there-

after with the other hand, inserts the tip of a metal hook into a hole at the top end of the knuckle and pulls the hook toward himself, thus opening the knuckle to its maximum width (if it was not so already). *Id.* Both switchmen then walk back to the rear of the next car to be uncoupled from the cut and repeat the process. Because *both* couplers are wide open as a car leaves the hump, there are substantially fewer instances of initial failure to couple in the bowl.[9] As a result, the railroad is able to operate the yard with two or three fewer switch engine crews. *Id.* at 205 (testimony of Charles F. Kelly) (JA 123). The financial saving is thus quite substantial.[10]

The hooks have a hooked tip on one end to slip into the hole in the top of the knuck-

Seaboard Coast Line Railroad Company, Rice Yard, Waycross, Georgia (JA 231).

At oral argument, counsel for appellants advanced for the first time the argument that such manual preparation would not be so hazardous if railways complied with the Blue Flag regulations, which require stopping and locking all traffic in the bowl for repairs. 49 C.F.R. § 218.23. This argument is without merit for two reasons. First, the scope of section 218.23 extends only to "workmen"—*i.e.,* "employees engaged in the inspection, testing, repair and servicing of rolling equipment." 49 C.F.R. § 218.21. "Workmen" are defined in 49 C.F.R. § 218.5(a) to *exclude* "train and yard" crews like switchmen. Second, the regulations are obviously directed at the repair of *defective* equipment, and the Federal Railroad Administration's (FRA) definition of defective couplers does not embrace otherwise functioning couplers that happen to have closed or become misaligned due to vibration. *See* 49 C.F.R. §§ 215.123, .125, .127, .129. While an action would lie for any injuries sustained in performing the manual preparation, because cars have failed to couple automatically, *see* note 39 *infra,* this does not make the coupler "defective" within the meaning of FRA *regulations,* and thus the Blue Flag regulations are not triggered by such a failure to couple.

7. The St. Louis-San Francisco Railway Company (Frisco) instituted the practice at its yards in Memphis and Tulsa in 1979, but after FRA requested voluntary cessation, Letter from Raymond K. James, Chief Counsel, FRA, to Donal L. Turkal, Frisco General Solicitor (Dec. 24, 1980) (JA 146), the company discontinued the practice. Deposition of Joseph William Walsh at 49 (JA 197). In November 1980, the Norfolk & Western Railway Company also required use of the hooks at its yard in Bellevue,

Ohio. Notice No. A–70–80 (JA 155); Notice No. A–69–80 (JA 156).

8. At oral argument, counsel for Seaboard acknowledged that once the moving cars are uncoupled, the hook is inserted "very shortly afterwards" into the lead car's rear knuckle. Former Chief Counsel James estimated that the space between the cars is "five feet, six feet, something like that," when the hook is inserted. Deposition of Raymond K. James at 11 (JA 180). FRA's Director of Office of Safety Programs estimated the distance to be between 16 and 36 inches. Deposition of Jean Chrisman at 27 (JA 169). One switchman maintained that the space was only sixteen inches. *See* Tr. of Special Safety Inquiry, *supra* note 4, at 41 (testimony of A.L. Peacock) (JA 95). *See also id.* at 20 (testimony of Tommy Lloyd) (JA 86) ("[T]here's a lot of cars that's close .... When you have several tank cars together they're real close and I've been bumped ...."). Since the slack in the drawbars permits freight cars to be coupled with varying space between them, the difference in the testimony may be accounted for by the amount of slack that might obtain at a particular time. What is significant, as we read the record, is that the hook procedure is necessarily employed *after* both cut-levers have been pulled and the cars have become uncoupled. Thus, the minimum distances would not normally exist at that time.

9. *See* Tr. of Special Safety Inquiry, *supra* note 4, at 203–04 (testimony of Charles F. Kelly) (JA 122–23); *id.* at 208 (testimony of T.A. Brown) (JA 126).

10. *See id.* at 203 (testimony of Charles F. Kelly) (JA 123) (estimating annual savings at $618,-000).

le and vary in length from 34 to 42 inches.[11] *See* Figure 1. While it is uncontested that the hook-wielding switchman must insert some portion of his body between the cars, *see* Brief for Intervenor at 8, the precise extent of such insertion is controverted.[12] It is clear, however, that the switchman is not required to insert his entire body between the cars or to cross the rails to stand between them.[13] Furthermore, the switchman pulls the hook at right angles to, and away from, the separated cars. *See* Figure 2.

11. As all parties to this action are undoubtedly aware, the gauge of the track is 4 feet 8½ inches. *See* Faulkner, *Railroads and Locomotives,* in 15 Encyclopedia Brittanica 482 (1974) (table). Thus 30 inches of the hook would normally reach the knuckle hole and eliminate any need for going between the tracks.

12. At oral argument, counsel for appellants maintained that "up to" half the body is inserted between the cars when using the hook. Before testimony was taken at the public hearing, John M. Sullivan, then Federal Railroad Administrator, viewed the practice as requiring the employee actually to *step* between moving cars. Notice of Special Safety Inquiry at 2 (JA 78). But Seaboard disputed that characterization during the hearings, *see* Tr. of Special Safety Inquiry, *supra* note 4, at 209 (testimony of A.A. Karle) (JA 127), and Chief Counsel Broadley found thereafter that switchmen "insert only their arm." Letter to John W. Weldon, Vice-President-Law, Family Lines Rail System, at 3 (June 16, 1981) (JA 224).

Moreover, Seaboard's employees are instructed *not* to place any other portion of their bodies between cars. In Bulletin Number 203 (dated Oct. 19, 1979), Seaboard admonishes that "[s]witchmen working the hump assignments will exercise care when pulling pins on the south side of the hump cuts [*i.e.,* the side on which hooks are employed] to insure they do not allow their body to go between the cars." Tr. of Special Safety Inquiry, *supra* note 4, at 212 (testimony of A.A. Karle) (JA 130). Seaboard has also taken steps to secure compliance with this instruction. *See id.* at 209 (JA 127) ("Our supervisors observe employees on the crest on a regular basis to assure compliance with these instructions."); Affidavit of John G. McCormick at 3 (JA 212) ("In addition to training, we also monitor employee coduct [sic] and circulate safety memoranda and notices, such as those pertaining to the use of the hook which emphasized that employees were never to step in between cars or to struggle with a stubborn knuckle. We do not simply post such notices—we require our employees to read them and sign an acknowledgment indicating that they read them.").

Of course, an employee might choose to ignore operating instructions, and such instances probably account for differing estimates of the extent to which a switchman inserts his body between cars. But there is substantial evidence to support Chief Counsel Broadley's finding that the procedure, *when performed as Seaboard directs,* requires that only the arm be inserted.

13. Tr. of Special Safety Inquiry, *supra* note 4, at 203 (testimony of Charles F. Kelly) (JA 121); *id.* at 209, 212 (testimony of A.A. Karle) (JA 127, 130); Affidavit of John G. McCormick at 3 (JA 212); Termination of Special Safety Inquiry at 3 (JA 220).

238

FIGURE 1

Statement of Daniel H. Greer, Seaboard Assistant Engineer, app. (Oct. 28, 1980) (prepared testimony submitted to Special Safety Inquiry, *supra* note 4), submitted to *United Transportation Union v. Lewis*, No. 81-0633 (D.D.C. Nov. 12, 1981) (Exhibit 14, Tab 4(d)).

**FIGURE 2**

The cut lever has been pulled up by the brakeman's left hand and the hook is being positioned in the knuckle by his right hand. The outline behind him is of the boxcar from which the lead car was uncoupled.

Piotrowski & Williamson, The Biomechanics of the Use of Hooks to Open Coupler Knuckles, fig. 3 (Nov. 10, 1980) (exhibit submitted to Special Safety Inquiry, *supra* note 4), submitted to *United Transportation Union v. Lewis,* No. 81-0633 (D.D.C. Nov. 12, 1981) (Exhibit 14, Tab 7).

---

B. *Investigations and Proceedings by the Federal Railroad Administration*

In April 1979, the Union requested that the Federal Railroad Administration (FRA) investigate the safety of the hook procedure at Seaboard's Rice Yard in Waycross, Georgia. FRA safety inspectors who visited the Rice Yard that summer judged the procedure to be unsafe and violative of section 2

of the Safety Appliance Acts.[14] Joseph W. Walsh, Associate Administrator for Safety, requested by letter that Seaboard stop using the hooks.[15]

Seaboard did not honor the request, however, and in December 1979 the Union requested FRA to order Seaboard to discontinue use of the hooks. Notice of Special Safety Inquiry at 3 (JA 79). FRA conducted further investigations at the Rice Yard in the summer of 1980, and the inspectors again found the procedure to be hazardous and illegal under section 2.[16] Seaboard again declined to halt the practice, and FRA issued a Notice of Special Safety Inquiry in order to gather information to determine whether regulatory action should be taken. Id. at 1 (JA 77). A public hearing was held at Waycross in October 1980.

After the hearing, Raymond K. James, then Chief Counsel of FRA, advised Seaboard[17] by letter that he deemed the procedure to violate section 2.[18] Seaboard nonetheless continued using the hook, and James subsequently requested the United States Attorney in Georgia to seek injunctive relief. Deposition of Raymond K. James at 13 (JA 182). Whether such relief would be sought was thus committed to the discretion of the U.S. Attorney. However, because James did not believe the practice was unsafe—or at least so unsafe as to

require emergency action[19]—he declined to recommend issuing an emergency order pursuant to 45 U.S.C. § 432(a). Id. at 10 (JA 179).

After a new national administration took office and designated another Administrator and Chief Counsel for FRA in 1981, the U.S. Attorney was requested to hold the matter in abeyance pending further instructions from FRA.[20] Broadley, the new Chief Counsel, reviewed the legal and factual background of the dispute and concluded that (1) the procedure does not violate section 2 or any other federal rail safety statute or regulation and (2) FRA should take no further action on the matter. 46 Fed. Reg. 32,364 (1981) (JA 222). The new Administrator, Robert W. Blanchette, accepted Broadley's recommendation that the inquiry be terminated. Blanchette concluded that the hook procedure (1) does not violate section 2 or any other federal rail statute or regulation, (2) does not create an undue hazard to hump employees, and (3) may contribute to employee safety by substantially reducing the number of manual couplings that must be made by switching operations in the bowl. Id. at 1–4 (JA 218–21). A notice terminating the Inquiry issued on June 16, 1981. Id. On the same day, Broadley advised Seaboard by letter of FRA's decision.[21]

14. Memorandum from J.A. Gates and W.A. Rogers, Safety Specialists, to Charles R. Meyrick, Director of Safety, Region Three, at 3 (Aug. 24, 1979) (JA 36).

15. Letter from J.W. Walsh to D.C. Hastings, Executive Vice President—Operations, Seaboard (Oct. 11, 1979) (JA 37).

16. E.g., Memorandum from F.N. Vincent, Operating Practices Safety Inspector, to Director of Railroad Safety, Region Three, at 2 (April 18, 1980) (JA 43).

17. James also advised the Frisco of his conclusion. Letter from Raymond K. James to Donal L. Turkal, Frisco General Solicitor (Dec. 24, 1980) (JA 146).

18. Letter from Raymond K. James to Edward Charron, Seaboard General Solicitor (Dec. 24, 1980) (JA 145).

19. James' subsequent testimony was as follows:

Q. As a result of that hearing [i.e., the Special Safety Inquiry] did you form any

opinion as to the safety of that operation using the uncoupling hooks?

A. Well, I have to say after the hearing and after observing the use of the hooks by railroad employees and after using a hook myself, it was a close question in my mind. I really hadn't made up my mind. I was leaning on what I learned at the hearing and observing the practice and doing it, I was leaning toward not feeling that it was an unsafe practice that necessitated immediate action to stop. On the other hand, it was not a pleasant experience personally to use the hook.

Deposition of Raymond K. James at 10 (JA 179) (emphasis added).

20. Memorandum from John H. Broadley, Chief Counsel-Designate, to Robert W. Blanchette, Administrator-Designate, at 1 (Feb. 6, 1981) (JA 147).

21. Letter from Broadley to John W. Weldon, Vice-President-Law, The Family Lines Rail System (June 16, 1981) (JA 222–26).

## C. District Court Proceedings

In March 1981, appellants brought this action in federal district court. Their amended complaint sought an emergency order, a writ of mandamus, an injunction, and a declaratory judgment to require the federal defendants, Blanchette and Drew Lewis, Secretary of Transportation, to order Seaboard and the Norfolk & Western to stop use of the hook. After denying the motion for a temporary restraining order, the court set the matter for a hearing on a preliminary injunction. However, the parties [22] stipulated to the submission of this matter through cross-motions for summary judgment. By agreement of counsel for all parties, the court first considered the issue of the emergency order. *United Transportation Union v. Lewis,* No. 81–0633, slip op. at 1 n.** (D.D.C. May 29, 1981) (JA 12). On May 29, 1981 the district court granted the agency's motion for summary judgment with respect to this issue on the ground that FRA's refusal to issue an emergency order was not unreasonable, arbitrary, capricious or otherwise not in accordance with law. *Id.* at 6 (JA 17).

After Administrator Blanchette issued a notice terminating the Special Safety Inquiry, the court considered the parties' cross-motions for summary judgment on the issue of whether the hook procedure violates section 2.[23] Appellants argued that the procedure required employees to interpose a material portion of their bodies between the cars in violation of section 2. Additionally, appellants asserted that to the extent FRA's decision was based on the premise that the use of hooks is "less unsafe" than other methods of uncoupling and going between cars that fail to couple automatically in the bowl, FRA had exceeded its authority, since the statute's express prohibition against going between the cars is not subject to balancing considerations. *Id.* at 4–5 (Nov. 12, 1981) (JA 22–23). Appellees responded by contending, *inter alia,* that the challenged practice is not covered by section 2 because that section was never intended to prohibit procedures during which an employee places only a *portion* of his body between the ends of the cars during uncoupling operations under circumstances that expose him to little or no risk of injury. FRA also asserted that it was appropriate to consider the procedure's impact on the safety of all yard employees in determining whether the procedure violates section 2. *Id.* at 6–7 (JA 24–25).

After reviewing the legislative history of the Safety Appliance Acts, the district court found it unnecessary to address the question whether section 2 prohibits placing a portion of one's body versus one's entire body between the ends of the cars. Instead, the court concluded that the statute is violated only when the railroad fails to provide proper equipment, and does not speak at all to the act of going between the ends of the cars. *Id.* at 11–12 (JA 29–30). Therefore, the court found the decision by FRA that the hook procedure does not violate section 2 was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* at 12 (JA 30).[24] On that basis the district court granted appellees' motion to dismiss or, in the alternative, for summary judgment. This appeal followed.

---

**22.** Seaboard's motion to intervene was granted on April 2, 1981. Docket Entries (JA 2).

**23.** At the hearing on the cross-motions for summary judgment, FRA had argued that Broadley's request that the U.S. Attorney hold the matter in abeyance pending further instructions indicated that the agency had not taken final action on this question and that it was still under consideration by the Administrator. Because FRA represented that final agency action was expected shortly, it was agreed that the court would defer its consideration of the legality of the hook procedure until then. Publica-

tion of the notice of termination on June 16, 1981, constituted such final agency action. 46 Fed.Reg. 32,364 (1981).

**24.** The district court also affirmed FRA's decisions to terminate the Special Safety Inquiry and to take no further action on the ground that the decisions were based on consideration of relevant factors, including the finding—albeit on grounds different from those relied on by the district court—that the practice does not violate the law. *United Transportation Union v. Lewis, supra,* slip op. at 14 (JA 32).

## II. ISSUES ON APPEAL

Appellants raise two issues on appeal. First, appellants argue that the district court erred in holding that section 2 is violated only when the railroad fails to provide properly functioning automatic couplers, but is not violated when an employee is required to go between the cars or to place a material portion of his body between the cars. Second, appellants urge reversal of the district court's finding that FRA's failure to issue an emergency order prohibiting the use of metal hooks was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

### A. The Scope of Section 2

#### 1. Standard of review

We are met at the outset by FRA's contention that its conclusion as to the legality of the hook procedure is entitled to "great deference." Brief for Appellees at 23–26. Appellees urge us to eschew *de novo* review of their construction of section 2, since in order to sustain an interpretation of a statute by the agency charged with its administration, " 'we need not find that [the agency's] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' " *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (quoting *Unemployment Compensation Comm'n v. Aragan,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946)). Accordingly, the agency's decision should be upheld "if it has a rational basis." Brief for Appellees at 25 & n. 7 (relying on *SEC v. New England Electric System,* 384 U.S. 176, 185, 86 S.Ct. 1397, 1402, 16 L.Ed.2d 456 (1966)).

While we shall continue to defer to the agency's construction of section 2 as it applies in other contexts, we decline to circumscribe our review with respect to this issue. Under the Administrative Procedure Act, a reviewing court must reverse an agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A). This is not a case where administrative interpretations are particularly persuasive, as where the agency participated in drafting the provision, *see Miller v. Youakim,* 440 U.S. 125, 144, 99 S.Ct. 957, 968, 59 L.Ed.2d 194 (1979), or where we must review a contemporaneous construction of a statute by those charged with the responsibility of setting its machinery in motion. *See Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). Insofar as construction of section 2 turns on a review of legislative history and case law, we are as able as FRA to conduct that review. We do defer to the agency's findings with respect to operating practices during uncoupling.

The most potent factor counseling against deferring to FRA's statutory interpretation, however, is the agency's inconsistency in interpreting section 2 with respect to the facts of this case. As we have observed, the agency reversed itself as to the construction of section 2 after the designation of a new Chief Counsel and Administrator. *See* Part IB *supra.* A statutory construction to which an agency has not consistently adhered is owed no deference. *General Electric Co. v. Gilbert,* 429 U.S. 125, 141–43, 97 S.Ct. 401, 410–412, 50 L.Ed.2d 343 (1976). Of the cases offered by FRA as entitling it to great deference, not a single one involved departure from an agency's prior construction.[25] Nor can *Gilbert* be

---

25. *See Miller v. Youakim, supra,* 440 U.S. at 144–45 n. 25, 99 S.Ct. at 968–969 n. 25 (deferring to "the agency's first and *only* national interpretation") (emphasis added); *Board of Governors v. First Lincolnwood Corp.,* 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978) (Board's position "frequently reiterated"); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978) (interpretation uniformly maintained for 80 years); *Bayside Enterprises, Inc.*

*v. NLRB,* 429 U.S. 298, 302, 97 S.Ct. 576, 579, 50 L.Ed.2d 494 (1977) (NLRB "has squarely *and consistently* rejected" opposing party's construction of the statute at issue) (emphasis added); *Train v. NRDC, Inc.,* 421 U.S. 60, 74, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975) (agency "has not abandoned its original view" of the scope of the statute); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 382, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) ("thirty years of consistent administrative construction");

distinguished here, as it was in *Miller v. Youakim, supra,* which disregarded as not "official" a prior inconsistent interpretation that had not emanated from correspondence signed by an agency's chief counsel. 440 U.S. at 144–45 n. 25, 99 S.Ct. at 968–969 n. 25. In the present case, Chief Counsel James took a position in official correspondence which is squarely at odds with the agency's present interpretation.[26] Accordingly, it would be entirely appropriate for this court not to accord deference to the agency's construction as to the scope of section 2 with respect to the facts of this case.

### 2. *The plain language of the Act*

■ As stated above, section 2 as enacted in 1893 provides:

> [I]t shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled[,] [27] *without the necessity of men going between the ends of the cars.*

45 U.S.C. § 2 (emphasis added). The central question is whether the words "without the necessity of men going between the ends of the cars" (1) merely describe the requisite automatic equipment or (2) whether they also impose an independent prohibition against the act of going between the ends of the cars during uncoupling operations.[28] In opting for the first of these two possible constructions, the district court's reading comports with the syntax of the provision: the only grammatically sound reading is one in which the participial phrase "coupling automatically by impact" and the clause "and which can be uncoupled" are both construed as modifying "couplers." In other words, both describe the *equipment* railroads are required to provide. In turn, the concluding phrase "without the necessity of men going between the ends of the cars" means that such equipment shall be capable of being operated from outside the cars. Nothing in the plain language suggests an intent to impose an independent prohibition against procedures that require men to go between cars.

Appellants object that such a construction renders meaningless the phrase "without the necessity of men going between the ends of the cars." Brief for Appellants at 13–16. This argument is wholly without merit, as the function of that phrase is to specify the *kind* of coupling equipment that will pass statutory muster—*i.e.,* couplers that will couple without the need for men to go between the ends of the cars. Partic-

---

*Udall v. Tallman, supra,* 380 U.S. at 17, 85 S.Ct. at 801 (agency "consistently construed" regulation at issue); *Commissioner v. Sternberger's Estate,* 348 U.S. 187, 199, 75 S.Ct. 229, 235, 99 L.Ed. 246 (1955) (deferring to "specific and *established* administrative interpretation") (emphasis added); *Kyle v. ICC,* 609 F.2d 540, 542 (D.C.Cir.1979) (per curiam) (only agency interpretation of an almost contemporaneous statute); *City of Vanceburg v. FERC,* 571 F.2d 630, 646 (D.C.Cir.1977) (no prior inconsistent constructions), *cert. denied,* 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 108 (1978).

**26.** *See* Letter from Raymond K. James to Edward A. Charron, Seaboard General Solicitor (Dec. 24, 1980) (JA 145).

**27.** As discussed below, the Supreme Court has expressly ruled that section 2 be read as if Congress had inserted a comma after the word "uncoupled." *Johnson v. Southern Pacific Co.,* 196 U.S. 1, 18–19, 25 S.Ct. 158, 162–163, 49 L.Ed. 363 (1904).

**28.** While it is not strictly relevant to the reasoning upon which we base our affirmance of the decision of the district court, we note that Congress spoke of *men, not parts of men,* in the concluding phrase of section 2. As we detail in Part II A3, *infra,* the hazards Congress sought to eliminate in 1893 by requiring the installation of automatic equipment flowed from the need for men to go *entirely between the tracks* in order to effect a coupling or uncoupling by the link-and-pin method. In fact, Congress was told that "sometimes [men] have to go under the platform to uncouple them." *Senate Hearings, infra,* at 57 (testimony of S.E. Wilkinson). In light of the evil Congress sought to eradicate in 1893 and the hazardous operating procedures that impelled passage of the Act, therefore, it cannot be said that *men* go between the ends of the cars when a switchman from outside the cars inserts an *arm* between them in wielding a hook long enough to reach the hole in the knuckle.

ularly when the Act is viewed in its historical perspective, that descriptive function is far from meaningless. At the time Congress enacted section 2, there existed coupling devices which, while *coupling* automatically by impact, nonetheless required brakemen to go between the cars and *uncouple* them by hand. *See Automatic Couplers and Power Brakes: Hearings Before the [Senate] Committee on Interstate Commerce on S. 811, S. 893 and S. 1698,* 52d Cong., 1st Sess. 14 (1892) (statement of W.E. Rodgers) (hereafter "*Senate Hearings*").[29] By adding the concluding phrase, Congress banned such coupler systems. Without the phrase, railroads would not even have been required to equip cars with cut-levers.

Furthermore, the Supreme Court has indicated that the contested phrase serves another function. In *Johnson v. Southern Pacific Co.,* 196 U.S. 1, 18–19, 25 S.Ct. 158, 162–163, 49 L.Ed. 363 (1904), the plaintiff was injured when he went between cars to accomplish a coupling after they had failed to couple on impact because their otherwise perfectly functional automatic couplers were not compatible with one another. *Id.* at 2, 16, 25 S.Ct. at 159, 161. The court dismissed as without merit the railroad's suggestion that the concluding phrase of section 2 applies only to the act of uncoupling. Congress, the court held, intended that whatever couplers were used had to be compatible so that coupling could take place without workmen having to go between cars. *Id.* at 19, 25 S.Ct. at 162. Accordingly, the Court advised that section 2 is to be read as if there were a comma after the word "uncoupled," so that the requirement imposed by the concluding phrase attaches to the coupling, as well as the uncoupling, features of the safety appliance: a licit coupler is one which can be coupled and uncoupled without men having to go between the ends of the cars. Consequently,

the concluding phrase performs the added function of requiring compatible couplers that couple automatically without the need to go between cars.

The concluding phrase of the statute thus describes the operating features of - the equipment in two respects. First, couplers must be so constructed that cars can be *uncoupled* without the necessity of men going between the ends of cars. Second, couplers must be *compatible* so that *coupling* can take place without men going between the ends of the cars. Therefore, the concluding phrase clearly describes the coupling equipment railroads are required to provide and is not rendered nugatory by so construing section 2.

Our conclusion that section 2, on its face, only prescribes mandatory safety equipment is strengthened when that provision is read in context with the rest of the Safety Appliance Acts. Indeed, the title of the 1893 Act indicates that the congressional focus was directed at the safety *appliances* with which railroads were to equip their rolling stock:

> An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce *to equip* their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes.

Act of March 2, 1893, ch. 196, § 2, 27 Stat. 531 (emphasis added). Thus, railroads violate the Act whenever they haul or use in interstate commerce cars that are not "equipped" as provided by the statute. *See* 45 U.S.C. § 1 (requiring engines to be equipped with power driving-wheel brakes); *id.* § 4 (requiring cars to have grab irons on the ends and on the sides); *id.* § 5 (authorizing the promulgation of standards for height of drawbars).[30] Indeed, the full title

---

**29.** *See* note 34 *infra.*

**30.** Section 3 permits a railroad that complies with section 1 to refuse to receive any cars not equipped with brakes compatible with its own. 45 U.S.C. § 3. Section 6 establishes penalties for failure to comply with the Act. *Id.* § 6.

Section 8 (now 45 U.S.C. § 7) eliminates the defense of assumption of risk for injuries resulting from equipment not in compliance with the Act. Section 7 permitted the Interstate Commerce Commission to grant extensions of time for compliance, but all ICC powers, duties and functions relating to safety appliances and

of the 1893 Act indicates that its focus is on "compelling carriers ... *to equip* their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes ...." 27 Stat. 531 (1893) (emphasis added).[31]

Finally, appellants have not faced up to the practical consequences of the construction they urge upon us. If the statute is read as a blanket prohibition against going between cars during coupling operations, it would make licit coupling an impossibility. In the last step of the coupling process, men must go between the rails to couple hoses for the air brakes.[32] Appellants' construction would effectively prohibit the performance of this everyday operation because generally it cannot be accomplished from outside the *rails,* much less from outside the cars.[33] Congress could not possibly have intended such a result, as it was the 1893 Act itself which initiated the requirement that cars be equipped with air brakes. *See* 27 Stat. 531 (1893), codified at 45 U.S.C. § 9; *United States v. Chesapeake & Ohio Ry.,* 247 F. 49, 50–51 (4th Cir.1917).

Given the plain language of section 2 and the equipment orientation which permeates the statutory scheme of the Safety Appliance Acts, we cannot conclude that Congress also intended to make it unlawful to go between cars during the coupling and uncoupling operations referred to in section 2. The Act, in short, does not address operating procedures.

3. *Legislative history*

█ As we have seen, the language of section 2 clearly reveals the intent of Congress to mandate the use of certain equipment on railroads by making it "unlawful" for railroads to haul in interstate commerce cars that are "not equipped" with certain appliances as required by the Act. Where the congressional intent is clear, resort to aids of construction such as legislative history is unnecessary to interpret the statute. *See, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive."). However, in view of appellants' contention that adherence to this plain meaning would permit a result "contrary to the goal Congress intended to effectuate [in 1893,] *i.e.,* the elimination of the risks in coupling and uncoupling," Brief for Appellants at 23, we consider extrinsic evidence in determining the proper construction of section 2. *See Cass v. United States,* 417 U.S. 72, 77, 94 S.Ct. 2167, 2170, 40 L.Ed.2d 668 (1974) (Where statutory language is "arguably subject" to another interpretation, resort to extrinsic aids is warranted.).

Review of the extrinsic evidence bolsters our conclusion that section 2 was intended only to prescribe safety appliances. The impetus for the Safety Appliance Acts was the great national concern over the unconscionable numbers of deaths and injuries among railroad employees. In 1889, the President reported that over 2,000 railway employees had been killed and more than 20,000 had been injured in a single year, and he called for legislation that would

equipment on railroad engines and cars were transferred to and vested in the Secretary of Transportation by Pub.L. No. 89–670, 80 Stat. 931 (1966). *See* 49 U.S.C. § 1655(e)(1).

**31.** We also note that the Senate hearings on the Safety Appliance Acts bear the descriptive title "Automatic Couplers and Power Brakes" —a further indication that the congressional focus was on equipment, not procedures. *Senate Hearings, supra,* at 1.

**32.** It was acknowledged at oral argument that after couplers have engaged it is generally nec-

essary for men to go between the cars to couple the air hoses. For a picture of this operation, see Corliss, *Railroad,* in 14 World Book Encyclopedia 6781, fig. 3 (1958).

**33.** Appellants' construction would even make use of the *cut-lever* a technical violation of the Act, since, as counsel for appellants conceded at oral argument, a switchman must place his hand between cars to operate the cut-lever, the end of which does *not* extend beyond the side of the car and is thus between the cars.

"require *uniformity in the construction of cars* used in interstate commerce and *the use of improved safety appliances* upon such trains." S.Rep. No. 1049, 52d Cong., 1st Sess. 1 (1892) (emphasis added) (hereafter "Senate Report"). The President's two principal objectives—uniformity and improved appliances—comprised the focus of congressional deliberations throughout the process of enacting section 2.

The prevailing coupling system in use in 1892 was the link-and-pin coupler, which required brakemen to stand *entirely* between the rails to couple and uncouple cars. For a picture of the very hazardous link-and-pin coupling operations as they were carried out in 1892, see Figure 3. The grave risk of death or injury from such an operation is self-evident. Moreover, such "automatic" couplers as were then in use did little to reduce that risk. Some still had to be coupled manually from a position entirely between the cars. Worse, there were an estimated 7,000 patents on automatic couplers and thirty-seven different types available. H.R.Rep. No. 1678, 52d Cong., 1st Sess. 5–6 (1892) (hereafter "House Report"). A brakeman could not be sure that any one coupler would couple with another, and he usually had to go between the cars before he could even determine how the cars were to be coupled. *See* Senate Report, *supra,* at 5. Far from eliminating the risks of coupling operations, therefore, the introduction of myriad types of automatic couplers frequently exacerbated the danger.[34] *Id.;* House Report, *supra,* at 3.

Coupling with the Link and Pin Coupler. A dangerous practice requiring that the trainman go between moving cars and direct the link into the

---

**34.** The extent of these dangers was brought home forcefully during the House committee hearings on the bill in 1892. Testifying on behalf of the Switchmen's Mutual Aid Associa-

To reduce such risks, Congress determined to mandate the provision of couplers that can be coupled and uncoupled from outside the cars, and which are fully compatible with one another. House Report, *supra,* at 3; Senate Report, *supra,* at 6. Given this focus on equipment, it is not surprising that appellants can advert to nothing in the legislative history which might demonstrate that Congress also intended to regulate operating procedures or to make it unlawful for men to go between cars. The history *is* replete, however, with references to the need to prescribe requisite equipment. *See, e.g.,* House Report, *supra,* at 1 (Accident statistics "awakened popular interest and formed a strong public opinion demanding legislation *requiring the use of safety appliances.*") (emphasis added); *Senate Hearings, supra* at 7 (testimony of W.E. Rodgers) (reporting that the Convention of the Railroad Commissioners of the United States had adopted a resolution calling for legislation "to compel *the adoption of an automatic safety car coupler*") (emphasis added); *id.* at 40 (testimony of H.S. Haines) ("What we all want . . . is *a coupler* which can be used without danger to the life or to the limb of the man who manipulates it.") (emphasis added).

Appellants nonetheless admonish this court to " 'interpret the meaning of the words [of section 2] as they are used in relation to the setting in which they were written, with due regard to the mischief which the legislation was designed to remedy.' " Brief for Appellants at 16 (quoting *Scott v. Moore,* 640 F.2d 708, 727 (5th Cir. 1981), *modified on other grounds,* 680 F.2d 979 (5th Cir.1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982)). This we have done. But appellants are really asking us to find in the lawmakers' recitation of the "mischief" that gave rise to the Safety Appliance Acts evidence that Congress intended to provide a "remedy" it never contemplated or provided. The actual remedy chosen by Congress is described by the House Committee that reported the bill as follows:

### REMEDY SUGGESTED.

It is the judgment of this committee that all cars and locomotives should be equipped with automatic couplers, obviating the necessity of the men going be-

---

tion of North America, John Downey made the following remark based on his twenty years of experience in switching cars:

You want to understand that the switchman's life in the daytime has an even chance with death. But a man who works after dark has not a ghost of a show under the present condition of things. All he has is a little bit of a hand lantern which throws a light probably 10, 15, or 20 feet. He goes in to make a coupling. He does not know the conditions that exist there. He can not tell whether it is a Janney or a Hinson, a Dowling, a Drexel, or some other kind of a drawbar. He can not tell whether it is a link-and-pin coupler or an automatic. And in the zeal he manifests to do his work properly his discretion some-

times gets the better of him, but he has got to couple those cars, and at night he can not make any preparations to do so until the last moment just as the cars come together. If there was a standard coupler adopted, in these instances he would know what to expect and would not have to wait until the last moment to get around and do this work. Freight cars are handled very recklessly; they are thrown around very recklessly, and sometimes men have to make couplings when cars are moving at the rate of 6, 8, 10, and 12 miles an hour.

*Automatic Couplers and Power Brakes: Hearings Before the Committee on Interstate and Foreign Commerce of the House of Representatives,* 52d Cong., 1st Sess. 11 (1892).

tween the cars, and continuous train brakes that can be operated from the locomotive and dispense with the use of men on the tops of the cars; that the locomotives should be provided with power driving-wheel brakes rendering them easy of control.

House Report, *supra,* at 3 (emphasis added). Again, the focus on equipment is central. Moreover, the participial phrase used in the Report (here without even the arguably more attenuated "*and* which" construction of the statute itself) reaffirms our reading of the plain language of section 2: "obviating the necessity" can only modify the *kinds* of couplers with which cars and locomotives shall be equipped.[35] In sum, we cannot reshape the remedy selected by Congress in 1893 because appellants contend a new procedure may have revived an old "mischief." In this respect, appellants have advanced "a legislative, not a legal, argument." *Schweiker v. Wilson,* 450 U.S. 221, 238, 101 S.Ct. 1074, 1084, 67 L.Ed.2d 186 (1981). And as we observe in Part IIB *infra,* accident statistics associated with the hook pro-

cedure do not suggest that the old mischief has been revived.[36]

Finally, appellants obfuscate the legislative history and case law by adducing therefrom allusions to the need to preserve "life *and limb*" as evidence that Congress must have intended to add an independent requirement prohibiting the insertion of a "limb" between cars. Brief for Appellants at 18, 25–26. As a linguistic matter such contention is fatuous; "life and limb," as FRA rightly points out, is nothing more than a formulaic way of saying "death and injury." Brief for Appellees at 33–34. We decline to predicate an independent statutory requirement upon those exceptional instances when legislators and judges lapse into cliche.

### 4. *Case Law*

Because we interpret the language and legislative history of the Act as speaking only to functional characteristics of safety appliances that must be installed on cars to be hauled in interstate commerce, we reject appellants' suggestion that the statute con-

**35.** We note, by way of comparison, that on one occasion appellants have changed the wording of section 2 better to support their interpretation of the statute, *i.e.:* "Congress determined that the best method ... would be to require all cars to be equipped with automatic couplers *and to obviate* the necessity of men going between the cars." Brief for Appellant at 19 (emphasis added). When so expressed, of course, the italicized phrase suggests that Congress intended to impose an independent requirement, but the Committee did *not* express such an intent, electing instead the participial phrase of the House Report, which—like the language of the statute itself—describes the operating characteristics of the equipment.

**36.** In this respect, it is instructive to note that, even in 1892, the Senate committee that considered the bill heard expert testimony that few hazards attend going *entirely* between the cars to *uncouple* them. W.E. Rodgers, a member of the National Committee on Safety Appliances (which was established by the Convention of the Railroad Commissioners of the United States), engaged in the following colloquy with a member of the Senate committee:

> Senator CHANDLER. What is the objection to requiring a person to go between the cars to uncouple them? Where is the danger in uncoupling?

> Mr. RODGERS. *Very little.* If a man is between the cars, and there is a movement of the train or something of that sort it would be dangerous, possibly, to be in between.... Of course if the cars are a considerable distance apart and are not moving *there is no particular danger. He goes in and opens the knuckle with his hand.*

*Senate Hearings, supra,* at 14 (testimony of W.E. Rodgers) (emphasis added). Rodgers nonetheless advocated the prescription of couplers that could be uncoupled from outside the cars, *id.,* and Congress did just that in section 2. But if the safety of going *entirely* between cars during uncoupling was considered a close question in 1892, the insertion of *only an arm* while using the hook is a much easier question. In 1890 alone, 369 employees were killed and 7,842 were injured during coupling and uncoupling operations. House Report, *supra,* at 2. By contrast, hump employees using the hook to prepare 2.5 million cars for coupling suffered only three minor injuries during the entire nine months of the Seaboard operation preceding the FRA hearings. Tr. of Special Safety Inquiry, *supra* note 4, at 210–11 (testimony of A.A. Karle) (JA 128–29); *see* pp. 252–253 *infra.*

tains a separate prohibition of men going between cars. Our view accords with that of the Supreme Court. *See, e.g., Johnson v. Southern Pacific Co., supra,* 196 U.S. at 19, 25 S.Ct. at 162 ("The risk of coupling and uncoupling was the evil sought to be remedied, and that risk was to be obviated *by the use of couplers* actually coupling automatically.") (emphasis added); *id.* at 16–17, 25 S.Ct. at 161–162 ("The point was that the railroad companies should be compelled ... *to adopt devices* ... which would act as to eliminate the danger consequent on men going between the cars.") (emphasis added). *See also St. Louis & San Francisco R.R. v. Conarty,* 238 U.S. 243, 250, 35 S.Ct. 785, 786, 59 L.Ed. 1290 (1915); *Southern Ry. v. Crockett,* 234 U.S. 725, 733, 34 S.Ct. 897, 900, 58 L.Ed. 1564 (1914). Moreover, the only case that has directly considered the construction that appellant here advocates concluded that the final phrase of section 2 is not an "independent requirement" but is instead merely "descriptive of the equipment required." *United States v. Illinois Central R.R.,* 170 F. 542, 550 (6th Cir.1909) (dictum). We agree.

The cases relied on by appellants do not support the broad contention that section 2 prohibits going partially—or even entirely—between cars. With but a single exception, every case cited by appellants involved the use of non-automatic, non-uniform or defective couplers.[37] Appellants' cases

merely demonstrate that once the predicate of malfunctioning equipment has been established, it is irrelevant whether a workman places all or part of his body between the cars. Indeed, if he is injured because of a defective coupler, he may recover without even having gone between the cars *at all. Southern Pacific Co. v. Mahl,* 406 F.2d 1201 (5th Cir.1969). But these cases cannot support the proposition that a violation of section 2 can be made out without proving that equipment has failed to perform as prescribed.

The only case appellants have cited, or which our diligent search has been able to find, in which the equipment was without defect is unavailing. In *Crabtree v. Kurn,* 351 Mo. 628, 173 S.W.2d 851 (1943), plaintiff's decedent was killed while attempting to perform a "flying switch"—an ordinary operation for uncoupling and switching a car onto a different track while the train and car are in motion on a single track—as he stood on the pilot sill or step on the front of the engine. Without analyzing the legislative history, the court held that no imperfection in the appliances was needed to give rise to liability under section 2, for if the railroad operates its rolling stock in such a way that the appliances cannot be used without going between cars, it violates the statute as fully as if the appliances were defective or it had failed to install the prop-

---

**37.** *See O'Donnell v. Elgin, Joliet & Eastern Ry.,* 338 U.S. 384, 385–86, 70 S.Ct. 200, 202, 94 L.Ed. 187 (1949) (accident resulted from "breaking of coupler"); *Chicago Rock Island & Pacific Ry. v. Brown,* 229 U.S. 317, 319, 33 S.Ct. 840, 57 L.Ed. 1204 (1913) (safety appliance "would not operate"); *Johnson v. Southern Pacific Ry., supra,* 196 U.S. at 7, 25 S.Ct. 158 (couplers not interchangeable); *United States v. Houston Belt & Terminal Ry.,* 210 F.2d 421, 422 (5th Cir.1954) ("admittedly defective freightcars"); *Payne v. Colvin,* 276 F. 15, 16 (7th Cir.) (cut-lever pulled "three or four times, but without any effect in opening the closed knuckle"), *cert. denied,* 257 U.S. 652, 42 S.Ct. 92, 66 L.Ed. 417 (1921); *Chesapeake & Ohio Ry. v. United States,* 249 F. 805, 806 (6th Cir.) (safety appliances "defective"), *cert. denied,* 248 U.S. 580, 39 S.Ct. 67, 63 L.Ed. 431 (1918); *Southern Ry. v. Snyder,* 187 F. 492, 493 (6th Cir.1911) (coupled "out of repair"); *Wabash R.R. v. United States,* 168 F. 1, 2 (7th

Cir.1909) (car "not equipped with automatic couplers"); *United States v. Philadelphia & R. Ry.,* 223 F. 215, 216 (E.D.Pa.1915) ("uncoupling device was out of commission"); *United States v. Chicago Rock Island & Pacific Ry.,* 173 F. 684, 684 (W.D.Mo.1908) ("uncoupling chain 'kinked' and wedged in the coupler head," making it "impossible to operate" without going between cars); *United States v. Nevada County Narrow Gauge R.R.,* 167 F. 695, 695 (N.D. Cal.1908) ("allegation that the couplers were out of repair and inoperative"); *United States v. Central Georgia Ry.,* 157 F. 893, 894 (N.D. Ala.1907) (cars "alleged not to have been equipped with the safety appliances required by the statute"); *McGee v. Burlington Northern, Inc.,* 174 Mont. 466, 571 P.2d 784, 787 (Mont.1977) (coupling pin did not remain in "up" position); *San Antonio & A.P. Ry. v. Wagner,* 166 S.W. 24, 28 (Tex.Cir.App.1914), *aff'd,* 241 U.S. 476, 36 S.Ct. 626, 60 L.Ed. 1110 (1916) ("defective coupler").

er appliances. 173 S.W.2d at 855 (citing *Christy v. Wabash Ry.,* 195 Mo.App. 232, 191 S.W. 241, 244 (1916), *writ dismissed,* 246 U.S. 656, 38 S.Ct. 424, 62 L.Ed. 924 (1918)).

*Crabtree* is distinguishable on its facts from the present case. Here Seaboard has not imposed a procedure such that switchmen cannot operate the couplers as they are designed to be operated—*i.e.,* from outside the cars. Rather, the hook procedure was instituted to be used immediately after the cars are uncoupled in order to increase the frequency with which couplings are accomplished in the bowl as the statute commands. *See, e.g.,* Tr. of Special Safety Inquiry, *supra* note 4, at 205 (testimony of Charles F. Kelly) (JA 123). We are not confronted, in other words, with a situation in which the railroad prevents the proper employment of its safety appliances. This case does not present a situation in which a railroad has installed appropriate equipment which it operates in a manner that is dangerous and altogether different from the manner contemplated by its design. While we hold that section 2 merely requires a certain type of equipment, we recognize that an employer might be liable if such proper equipment were operated in a manner that creates the serious hazards the legislative history indicates impelled passage of the statute. *See* Figure 3, *supra;* Part IIA3 & notes 34, 36 *supra.*

Consequently, *Crabtree* can be readily reconciled with our interpretation of section 2. The court described the jury's findings as follows:

> With cars and an engine coupled as these were, the jury found that the safest, proper, customary place for the switchman to stand and perform his duty of lifting the pin during a "flying" switch

was on the pilot sill or step on the *front* of the engine and that he could not stand on that step *or elsewhere on the east side of the engine* and lift the pin without and except that his body be between the engine and car to be disconnected.

173 S.W.2d at 854 (emphasis added). The railroad's liability in *Crabtree,* therefore, can be described as flowing from its failure to equip its engine properly so that the switchman could lift the pin without having to go between the cars during a flying switch. In other words, the railroad violated section 2 by failing to provide proper equipment. To the extent *Crabtree* purports to find in section 2 an independent prohibition against going between cars, we decline to follow it.[38]

Finally, as we have observed, the bowl is a hazardous area and the hook procedure may contribute substantially to the safety of all yard employees by reducing the number of couplings that must be made in the bowl. *See* pp. 235–236, 240–241 *supra.* Conspicuously absent from appellants' presentation is any reference to a means or method, other than automatic realigning devices, which are still in the experimental stage, *see* note 5 *supra;* note 39 *infra,* that is as safe or safer than the hook procedure. It would make scant sense to read legislation designed to promote safety to force elimination of a procedure that may, in fact, reduce hazards when complainants have failed to show any currently available, safer alternative. *See* Letter from John H. Broadley, FRA Chief Counsel, to John W. Weldon, Vice-President-Law, Family Lines Rail System, at 2 (June 16, 1981) (JA 220) (FRA concludes that "[r]eliance upon the uncoupling lever alone, without use of the hook, appears to result in a significant in-

---

**38.** Appellees seek to distinguish *Crabtree* and other authorities relied on by appellants on the further ground that they were brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.* (FELA). Brief for Appellees at 36–37. But, as the district court observed, *United Transportation Union v. Lewis, supra,* slip op. at 11–12 & n.\* (JA 29–30), the Supreme Court has refused to apply different standards of liability for civil penalty cases and FELA damage actions:

> "Indeed, a survey of the entire statute leaves no room to doubt that all violations thereof are put in the same category, and that whatever properly would be deemed a violation in an action to recover for personal injuries is deemed equally a violation in an action to recover a penalty."

*Chicago, Burlington & Quincy Ry. v. United States,* 220 U.S. 559, 577, 31 S.Ct. 612, 616, 55 L.Ed. 582 (1911) (quoting with approval *United States v. Atchison, Topeka & Santa Fe Ry.,* 163 F. 517 (8th Cir.1908) (Van DeVanter, J.)).

crease in the number of manual couplings which must be made in the bowl of the yard. It is well documented that such work is among the most hazardous in railroading, a statistical conclusion which is consistent with subjective observation of the procedure.").

■ We hold, therefore, that the scope of section 2 is confined to the requirement that railroad cars be "equipped" with automatic couplers that can be operated without the necessity of men going between the ends of the cars, and we conclude that the statute does not separately prohibit the act of going between cars. In other words, the mere operation of the hook is not a *per se* violation of the Safety Appliance Acts. The predicate for liability under section 2 is the failure to provide equipment that functions as the statute commands.[39] Accordingly, like the district court, we find the decision of the FRA that the hook procedure does not violate section 2 is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

B. *The Failure to Issue an Emergency Order*

Under certain very limited circumstances, a district court is empowered under section 203(e) of the Federal Railroad Safety Act of 1970, 45 U.S.C. § 432(e), to order the Secretary[40] to issue an emergency order pursuant to 45 U.S.C. § 432(a). Subsection (e) provides:

Any employee of a common carrier by railroad engaged in interstate or foreign commerce who may be exposed to imminent physical injury in the course of his employment because of the Secretary's failure, without any reasonable basis, to seek relief under subsection (a) of this section, or the authorized representative of such an employee, shall have the right to bring an action against the Secretary in the United States district court for the judicial district in which the emergency situation is alleged to exist or in which the employer has its principal executive office, or for the District of Columbia, to compel the Secretary to issue an order under this section. The failure of the Secretary to seek relief under subsection (a) of this section shall be reviewed solely under the standards of section 706 of title 5, United States Code.

Subsection (a) provides:

If the Secretary determines, on the basis of testing, inspection, investigation, or

**39.** Appellants maintain that "a condition precedent to the use of metal hooks is the statutory violation of failure to provide the proper equipment." Brief for Appellants at 33 n. 8. This argument is without merit. As we have already noted, *see* note 5 *supra,* automatic coupler realigning devices are still in the ·experimental stage and have been installed on less than one percent of railroad cars. Congress in 1893 surely could not have intended to forbid the hauling of cars without devices whose development was not contemplated and even now is not complete. We shrink from accepting a reading of section 2 that would be tantamount to a pronouncement that 99% of all railroad cars violate section 2—and have done so for the entire 90 years the Act has been in effect.

At the same time, however, *actual failure* to couple automatically because of a misaligned drawbar or a closed coupler is sufficient to establish liability under section 2. *See Metcalfe v. Atchison, Topeka & Santa Fe Ry., supra,* 491 F.2d at 896 and cases cited therein. This is because Congress imposed on railroads a duty not just to *provide* proper equipment, but also to *guarantee its performance. See Affolder v. New York, Chicago & St. Louis*

*R.R.,* 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683 (1950); *Carter v. Atlanta & St. Andrews Bay R.R.,* 338 U.S. 430, 70 S.Ct. 226, 94 L.Ed. 236 (1949); *Delk v. St. Louis & San Francisco Ry.,* 220 U.S. 580, 31 S.Ct. 617, 55 L.Ed. 590 (1911). And FRA continues to adhere to this view of the railroad's responsibility. *See* Brief for Appellees at 35. When the hook procedure is performed just below the crest of the hump after the lead car has been uncoupled, however, no coupler has malfunctioned. Procedures taken in order to increase the efficiency of coupling, to prevent violations, and taken before it can be known if a malfunction will in fact occur, are not evidence that the equipment is defective.

**40.** Although section 203(a) vests authority to issue an emergency order in the Secretary, in practice he relies on FRA to recommend issuance after its investigation. In the present case FRA did not recommend action to the Secretary, and as a result it is *FRA's* decision that is being challenged. Technically, however, it is the Secretary's failure to issue an order that triggers judicial review. 45 U.S.C. § 432(e).

research carried out pursuant to this title, that an unsafe condition or practice, or a combination of unsafe conditions or practices, or both, create an emergency situation involving a hazard of death or injury to persons, the Secretary may immediately issue an order, without regard to the provisions of section 202(b) of this title, imposing such restrictions or prohibitions as may be necessary to bring about the abatement of such emergency situation.

Thus, the statutory scheme of section 203 is fairly straightforward. Under subsection (a), if FRA determines that an "unsafe condition or practice" has created "an emergency situation involving a hazard of death or injury to persons," then in its discretion FRA "*may* immediately issue an order" directing that the emergency situation be abated. If FRA fails to issue an emergency order, an employee may ask a district court to *compel* FRA to issue an emergency order where the employee "may be exposed to imminent physical injury . . . because of the Secretary's failure, *without any reasonable basis,* to seek relief under subsection (a)."

Subsection (e) also provides that the failure to issue an emergency order "shall be reviewed solely under the standards of section 706 of title 5, United States Code." The Supreme Court has made clear that the "arbitrary and capricious standard" of the Administrative Procedure Act is "highly deferential" and presumes the validity of agency action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). *See also Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). If the court can discern a rational basis for the agency's decision, that decision must be affirmed. *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419

U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974); *United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972). Similarly, the court must uphold the agency's construction of the statute unless it is plainly unreasonable. *E.I. DuPont de Nemours & Co. v. Train,* 430 U.S. 112, 134–35, 97 S.Ct. 965, 978–979, 51 L.Ed.2d 204 (1977); *Train v. NRDC,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975); *Lead Industries Ass'n v. EPA,* 647 F.2d 1130, 1147 (D.C.Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980). Applying these standards, we agree with the district court that appellants have not carried their burden of demonstrating the absence of "any reasonable basis" for the decision not to seek emergency relief. *See United Transportation Union v. Lewis, supra,* slip op. at 6 (JA 17).

It is clear that FRA has conducted a thorough investigation of the risks entailed by the use of metal hooks. Several safety inspections were carried out in the summers of 1979 and 1980, and a public hearing provided appellants an opportunity to be heard on the matter. *See* Part IB *supra.* While some FRA personnel deemed the procedure to be hazardous, and one inspector recommended seeking an emergency order,[41] FRA made a contrary finding. FRA is the agency that is granted the authority and charged with the responsibility to make such findings, and nothing in the record convinces us that those findings were unreasonable.

In support of FRA's determination not to seek emergency relief, we note that only three reportable injuries had occurred in handling over 2.5 million cars during the period from January 1979 (the date the hook procedure was initiated) through October 1980 (the date of the Inquiry).[42] Tr. of Special Safety Inquiry, *supra* note 4, at

---

**41.** *See* Memorandum from F.N. Vincent, Operating Practices Safety Inspector, to Director of Railroad Safety, Region Three, at 2 (April 18, 1980) (JA 43).

**42.** In the district court appellants contended that four employees had sustained injuries.

*United Transportation Union v. Lewis, supra,* slip op. at 5 n.* (JA 16). The discrepancy apparently results from the fact that one of the injuries was not reportable under FRA standards. *See* 49 C.F.R. § 225.19(d) (1980).

210–11 (testimony of A.A. Karle) (JA 128–29). This record translates into an injury rate of one per 1.2 million uses of metal hooks. *Id.* at 223 (testimony of Waldo Wingate) (JA 141). None of the injuries were permanently disabling and there have been no fatalities. Moreover, all the injuries resulted from employees having fallen *away* from the moving cars.[43] Finally, all three injuries had resulted from a hook's breaking while in use, *id.* at 210–11 (testimony of A.A. Karle) (JA 128–29), and no injuries had occurred since structural improvements were made to the hook. *Id.* at 217–19 (testimony of Daniel H. Greer) (J.A. 135–37). Such facts hardly warrant a finding that FRA's decision was "without any reasonable basis." 45 U.S.C. § 432(e).

It also bears noting that the decision by the FRA *not* to seek an emergency order was made before the change in the national administration in 1981. In 1980 both FRA's Associate Administrator for Safety, Joseph W. Walsh, and then Chief Counsel, Raymond K. James, viewed the potential hazards of the hook procedure as *not* rising to the level of those circumstances that had provoked emergency relief in the past. Walsh testified that, in his opinion, issuance of such an order had never been appropriate. Deposition of Joseph William Walsh at 54 (JA 199). James testified that, although he considered the question, he rejected emergency relief because "there was not a serious history of accidents and the practice did not seem imminently dangerous to the safety of employees." Deposition of Raymond K. James at 15 (JA 184). Six emergency orders having issued during James' tenure as Chief Counsel, he was very familiar with past administrative practices and the kinds of hazards that would support emergency relief. *Id.* at 23 (JA 192). Yet after attending the hearing, making his own observations, and even using the hook himself, *id.* at 10 (JA 179), James concluded that an emergency order would be "inappropriate." *Id.* at 15 (JA 184); *see* note 18 *supra.*

The record evinces substantial evidence to support these findings and careful consideration of relevant factors. We cannot conclude that this is one of "those egregious cases in which the Secretary has completely ignored a hazardous situation." 126 Cong. Rec.S. 13,337 (daily ed. Sept. 24, 1980) (remarks of Senator Cannon). The district court, in our opinion, properly assessed and performed its role. We therefore find under the standard of review imposed by subsection (e) that FRA could not be compelled to issue an emergency order on the facts presented.

### III. CONCLUSION

For the reasons heretofore stated, the decisions of the district court rendered in case No. 81–0633 on May 29, 1981 and November 12, 1981 are hereby affirmed.

*Judgment accordingly.*

---

**43.** *See* Tr. of Special Safety Inquiry, *supra* note 4, at 210–11 (testimony of A.A. Karle) (JA 128–29); Memorandum from Chief Counsel-

Designate to Administrator-Designate at 2 (Feb. 6, 1981) (JA 148).